J. EDWARD FARNUM and GEORGE L. FARNUM, administrators, &c.,

*v.*

THE PENNSYLVANIA COMPANY FOR INSURANCE ON LIVES AND GRANTING ANNUITIES et al.

[Submitted July 15th, 1916.  Decided July 27th, 1916.]

1. The exercise of powers conferred by will is controlled by the law of the testator's domicile, notwithstanding the election of a foreign trustee and possession of the fund outside of the state.

2. Whether the donee of a power duly executed it depends on her intention as gathered from the terms of her will.

3. To determine whether or not the donee intended to execute the power by her will, the only testimony admissible is that showing the actual conditions of the donee's estate and of the trust fund, as distinguished from what she thought they were.

4. Parol evidence of a testator's declarations to show his intention or understanding of his will different from its legal significance, is incompetent.

5. General residuary bequests of "my estate" refer to the testatrix's own estate, and not property over which she had a power of appointment.

6. The revocation by codicil of the execution of a power before that time three times exercised, is evidence that the testatrix did not intend to exercise it by her last testamentary act.

On bill, &c.

*Messrs. McDermott & Enright,* for the complainants.

*Messrs. Grey & Archer* and *Mr. Nelson B. Gaskill,* for the defendants.

BACKES, V. C.

This is a bill for an accounting. Paul Farnum domiciled in Burlington county, died in 1859, leaving a last will and testament executed in 1856 and admitted to probate, in and by which he bequeathed:

"In addition to the House and lot of land in Arch Street Philadelphia in the hands of a trustee for the use of my Daughter Sarah E. Farnum, I give and bequeath unto the Pennsylvania Company for insurance on lives and Granting annuities located in the City of Philadelphia Pa. one hundred Thousand dollars in bonds or stocks, my said Daughters choice of such as I may die possessed, (Except Bank Stock which I divide between my sons) in trust Nevertheless for the use of my said Daughter Sarah E. Farnum, the interest or dividends ariseing therefrom to be paid by the said Company to the SOLE ORDER OF MY SAID DAUGHTER semi-annually during the term of her natural life, and not be liable for the debts nor affected by the extravagance or misfortunes of any husband she may Marry. And at the death of my said Daughter the principal SUM and such interest as may have accumulated and not paid, my mind and will is, and I direct said Company or trustees to pay over to such person or persons as my said Daughter by any instrument of writing in the nature of a Will executed under her hand and seal in the presence of two or more subscribing witnesses shall direct limit and appoint, or designate My will and design is that the House and lot in Arch Street shall pass in like manner to such person or persons as she may designate. (Provided however that I give the said Company my said trustee to Change any of the securities deposited with them whenever they may think proper during the life time of my aforesaid Daughter."

The administrators *cum testamento annexo* of Paul Farnum, deceased, claim that Sarah E. Farnum failed to exercise the power of appointment conferred upon her and filed this bill to recover the trust fund.

Sarah E. Farnum married one Batterson in 1866, and from that time on was a resident of Philadelphia, Pennsylvania. She died June 27th, 1915, leaving a last will and testament supplemented by two codicils, which were duly admitted to probate

by the register of wills of Philadelphia county. The will bears date February 2d, 1912, the first codicil April 23d, 1913, and the second October 15th, 1914. By the seventy-third item of the will she bequeathed as follows:

"One-half of all the rest, residue and remainder of my estate, real, personal and mixed, including that over which I have or may have a power of appointment, I give, devise and bequeath to [naming beneficiary] and the remaining one-half of said rest, residue and remainder I give, devise and bequeath to the following named societies, persons, institutions and corporations in the proportions mentioned, viz. [naming beneficiaries]."

By the twelfth item of the first codicil she substituted some of the residuary beneficiaries. The ninth paragraph of the second codicil reads as follows:

"9. I hereby revoke all the provisions of Item Seventy-three in my said will and all the bequests therein contained and I also revoke all the provisions of Item Twelve in said first codicil to my said will and all the bequests therein contained."

The remaining pertinent items of the second codicil are as follows:

"13. Out of the rest, residue and remainder of my estate, I give and bequeath unto [naming beneficiaries and amounts]."

"14. I give and bequeath one-fourth of said rest, residue and remainder of my estate unto [naming beneficiary]."

"15. I give and bequeath one-fourth of said rest, residue and remainder of my estate unto [naming beneficiary]."

"17. Out of said residue and remainder of my estate I give and bequeath unto [naming beneficiaries and amounts]."

"18. All the rest, residue and remainder of my estate remaining, I give, bequeath and devise unto Miss Florence M. Moberly, who lives with me, absolutely."

Mrs. Batterson died possessed of personal property in her own right inventoried at $381,130.66. By her will she made absolute bequests aggregating $339,250. By her first codicil she increased the legacies $11,500; and as her will stood after the execution of the second codicil, and at the time of her death, the absolute bequests amounted to $295,850, and bequests for life of $60,000 with reverter to the residue, amounting in the

whole to $355,850. Inheritance tax and costs of administration deducted may leave the personal assets a shade short to meet, presently, the legacies, but upon the termination of the life-interest legacies there will be a substantial balance to be divided under the residuary clauses. To this balance is to be added the house referred to in Paul Farnum's will. There it is implied that this house was held in trust for Sarah E. Farnum. According to the statement contained in the brief of counsel it was in fact held by her in fee. There is no proof of this, but as counsel have exchanged briefs, and there is no denial, it will be assumed to be an admitted fact.

· The question presented for decision is, Does the will of Mrs. Batterson execute the power? It is argued by defendants' counsel that inasmuch as Mrs. Batterson was domiciled in Pennsylvania, and because the trust fund is in, and the trustee is a corporation of, that commonwealth, the point at issue ought to be decided according to the laws of that state, where the statute directs that a general bequest should be construed to include personal property, of which the testator had power to appoint, generally, and to operate as an execution of such power, unless the contrary intention appeared by the will. *P. L. 1879 p. 88.* The donor, at the time of the creation of the power, was a resident of New Jersey. So was the donee. The power was created and exists by virtue of the laws of this state, and it is settled law that the exercise of powers conferred by will is controlled by the law of the testator's domicile, both as to the execution of the power and the interpretation of it. *Rosenbaum* v. *Garrett, 57 N. J. Eq. 186; Bingham's Appeal, 64 Pa. St. 345; Sewall* v. *Wilmer, 132 Mass. 131; Tudor* v. *Vail, 195 Mass. 18; Cotting* v. *De Sartiges, 17 R. I. 668; 16 L. R. A. 367; Lane* v. *Lane, 64 L. R. A. 849; In re Philbrick, 209 N. Y. 585; Prince De Bearn* v. *Winans, 111 Md. 434; Rhode Island Hospital Trust Co.* v. *Dunnell, 83 Atl. Rep. 858.* The selection of a foreign trustee and possession of the fund outside of the state, does not affect the rule, for the reason that the property belongs to the estate of a testator domiciled here, and is to be administered according to our laws under the supervision of our courts, to which the trustee is amenable.

Whether Mrs. Batterson executed the power in the manner prescribed, depends upon her intention to exercise it, which intention, in some form of expression, must be found in her will. The intention to execute a power must always appear in its execution either by express terms or recitals or by necessary implication. A reference to the instrument by which the power is given, is, indeed, not necessary to demonstrate the intention to execute such a power, but it must appear from the will that the intention existed. It need not appear by express terms or recitals in the instrument; it is sufficient if the act shows that the donee had in view the subject of the power. *Meeker* v. *Breintnall, 38 N. J. Eq. 345.* If the quest were to be confined to an inspection and consideration of the will and codicils, there would be no difficulty in reaching the conclusion that they evince no intention to dispose of the property, the subject of the power. No allusion whatever is made in the many items of the will and codicils to the fund or the testatrix's control over it. By each of the items a specified sum of money is bequeathed, referable *prima facie* to her own private fortune, and by the residuary clauses "the rest, residue and remainder of *my* estate" is disposed of. A general devise or bequest by the donee of a power in which the testator refers to the property devised or bequeathed as his property, has been repeatedly held not to be an exercise of the power. *Wooster* v. *Cooper, 59 N. J. Eq. 204; Meeker* v. *Breintnall, supra; Ackerman* v. *Ackerman, 81 N. J. Eq. 437; Lee* v. *Simpson, 134 U. S. 572; Patterson* v. *Wilson, 64 Md. 193.*

At the hearing the defendants were given the widest latitude to prove intention. All of the testimony, aside from that which shows the condition of the testatrix's estate and of the trust fund—the actual conditions as distinguished from what she thought they were from representations made to her—was clearly inadmissible and will be disregarded. This testimony is to the effect that just before she made her will, Mrs. Batterson inquired of Mr. Gates, an official of the trustee (the trustee was also her attorney in fact, managing her private estate), what property she had individually and what the trust fund amounted to, and was informed that the former amounted to about $290,000, and the latter over $100,000, and that if the two funds were taken as

one estate there would be ample funds to pay all the legacies which she had provided for and the expenses of the administration, executors' fees, &c., leaving a residuary estate. Before executing the first codicil she again interviewed Mr. Gates and inquired whether there was sufficient in both estates to pay all the legacies provided for, saying that she wished to combine the two estates in the gift made under her will, and to include not only that which she owned in her own right, but that over which she had power of appointment under her father's will. While this evidence was illegal, it was not harmful, because the sentiment is reflected by the will. The second codicil was made in Portsmouth, New Hampshire. It was drawn by one Emery, a member of the bar of that state, who testified that he had three or four interviews with Mrs. Batterson, and that at the second one she told him that her property, as nearly as she could find out, amounted to $400,000, of which $300,000 was her own and over $100,000 of which she had a power of disposal at her death from her father. She further told him, he says, that other young men were interested in that fund and would like to receive it; that they were her nephews and that they had already had money which they had wasted. He says that she instructed him to draw the codicil so that all of her property, both the property which she had of her own and the trust fund would be included in the disposition of her estate, so that there would be a substantial residue, and particularly for Miss Moberly. He further testified that upon submitting the draft of the codicil for execution, she repeated her statement that the trust fund should not, under any circumstances, go to the people she had mentioned, and after reading it she asked him if what he had drawn included her own property and the trust fund, which he says he answered in the affirmative. The document was forwarded to the trustee for safe-keeping, and in May following, shortly before her death, Mrs. Batterson again asked Mr. Gates if she had sufficient estate, both in her own right and that over which she had power of appointment by her father's will, to provide for the payment of all legacies, and was told that she had, unless she had very materially increased the legacies, which she said she had not. Mr. Gates got his information of the standing of both estates from the

books of the company, and told her that there were $100,000 and upwards of the Farnum fund and of her own estate about $300,-000, and that there would be a surplus of from $75,000 to $100,-000 after payment of all specific legacies, costs of administration, taxes, &c. Mrs. Batterson also told him that she had made provision for the distribution of her residuary estate and that she was anxious that those she had named as residuary legatees should receive some share of her estate. Now, it may have been Mrs. Batterson's intention to execute the power, and it may have been her understanding that she had done so, but it is not our privilege to go beyond her testament for demonstrations. Parol evidence of a testator's declarations, or of representations made to him, tending to show his meaning and intention or understanding of his will, different from its legal significance and effect, has been uniformly rejected by the courts as incompetent. By law, wills must be in writing, signed and published by the testator in the presence of witnesses; and it would be inconsistent with that law to permit parol proof to be introduced to contradict, add to, or explain their contents. This principle requires an inflexible adherence to it, even if the consequence should be a partial, or even total, failure of the testator's intention. The formalities so carefully provided would be of no value; the statute itself would be virtually repealed, if when the written instrument is supposed not to express the clear intention of the testator, the deficiency may be supplied, and its mistakes corrected by extrinsic evidence. No principle connected with the law of wills is more firmly established or more familiar in its application than this; and it seems to have been acted upon by judges, of early and of later times as well, with a cordiality and steadiness, which shows how entirely it coincided with their own views. A firm adherence to the rule is necessary to avoid the consequences of the misapprehension of the witness, and the danger of offering temptation to perjury. *Nevius* v. *Martin, 30 N. J. Law 465.* See, also, *Cleveland* v. *Havens, 13 N. J. Eq. 101; Heater* v. *Hockenbery, 14 N. J. Eq. 159; Leigh* v. *Savidge, 14 N. J. Eq. 124; Burnet* v. *Burnet, 30 N. J. Eq. 595; Griscom* v. *Evens, 40 N. J. Law 402; Archer* v. *Morris, 61 N. J. Eq. 152; Zabriskie* v. *Huyler, 62 N. J. Eq. 697; affirmed, 64 N. J. Eq.*

*794; Hammel* v. *Barrett, 79 N. J. Eq. 96; Vrooman* v. *Virgil, 81 N. J. Eq. 301.*

Just a few words as to the testimony of Mr. Emery, the Portsmouth lawyer. If it were competent it would be risky to rely upon it. When he drew the second codicil he says he knew that Mrs. Batterson had authority to appoint her father's estate, and that his instructions were to make the appointment. He had before him her will in which the power was clearly exercised, and it is difficult to understand why, if the testatrix's intention in this respect had not changed, the words of appointment were not repeated. His explanation for omitting them was that he found in the American and English Encyclopedia a reference stating what the law of Pennsylvania was relating to the exercise of the powers, and he perhaps regarded the formula of the will as useless surplusage. No reflection upon his veracity is meant, but it is incomprehensible why he should have gambled with his client's interests and why he should have banked upon his very meagre knowledge of the laws of a foreign state to accomplish that which a few plain words would have expressed. The credibility of this testimony is not under consideration, and it is adverted to only to emphasize the wisdom of the rule which requires its exclusion.

The general residuary bequests are of "my estate." This, in the absence of some controlling incident, is to be regarded as relating to the testatrix's own property, and if the general bequests stood alone in the will, the terms used would permit of no explanatory proof that they were meant to include her father's estate. *Griscom* v. *Evens, supra; 2 Jarm. Wills (5th ed.) 275.* Nor can anything be gleaned from the numerous special bequests indicating that the testatrix had the appointment in mind and from which could be inferred that she intended to pass the subject of the power by the residuary clauses, as in *Blagge* v. *Miles, 1 Story 426; White* v. *Hicks, 33 N. Y. 383; Munson* v. *Berdan, 35 N. J. Eq. 376.*

It remains to be considered whether, upon a comparison of the amount of the estate of the testatrix with the sum total of the money bequests, an intention to exercise the power must necessarily be inferred. For this purpose, extrinsic evidence of a tes-

tator's circumstances, at the time of the making of the will, is admissible. *Massaker* v. *Massaker, 13 N. J. Eq. 264; Griscom* v. *Evens, supra; Burnet* v. *Burnet, supra; White* v. *Hicks, supra; Hutton* v. *Benkard, 92 N. Y. 295.* The burden is upon the party claiming under the power, and the proof must be such as to clearly raise the presumption to the exclusion of all other rational inferences. At the time of the making of the second codicil, and that time is all important, the personal assets of the testatrix exceeded by $25,000 the amount necessary to satisfy all of the legacies. This, it is true, is based upon an inventory of the estate made eleven months afterwards; but if there was any material change during that period, it was for the defendants to show. Payment of collateral inheritance tax and other necessary disbursements reduced the estate to $360,755, and administration expenses will further deplete to the extent of some $20,-000. Counsel, in his claim that there would be a deficiency of about $15,000, and nothing left to pass under the residuary bequests, overlooked the fact that the income during the year of administration will equal the costs of administration. He also failed to include in his calculation the value of the Philadelphia house and did not take into consideration $60,000 remainder-money, all of which will contribute to the residue and eventually pass to the general legatees. This state of affairs manifestly precludes the one and only inference upon which the claim of the defendants in this respect is predicated. And even if it were conceded that a trifling deficiency existed, such an inference would not be imperative and it would be straining judicial limitations to raise from this circumstance alone a positive legal presumption of the execution of the power. The predicament, if it exists, and upon which the defendants rest their principal argument, sprung up in a measure *post-mortem*, and it is reasonable to assume that it was not foreseen. Taking into consideration all of the admissible circumstances surrounding the execution of the second codicil, it certainly cannot be said that Mrs. Batterson contemplated that at the time of her death her large and growing estate would not equal her bounties. The fact that it did, and exceeded them, is proof to the contrary. There is no evidence to show how old she was or her condition of

health, and although it appears that she died shortly after the execution of the last codicil, there is nothing in the case from which can be assumed that she anticipated an early demise. In *Bingham's Appeal, supra,* cited on the briefs of both counsel, Judge Agnew says: "The mere fact that the bequests in a will exceed the testator's estate cannot draw after it an intention to execute the power. The excess may arise from a mistaken estimate, or from changes in the testator's property—a mistake common to that numerous class who keep no accounts, or imperfect ones, of their affairs. The evidence of this is the common occurrence of the abatement of legacies. In the present case, Alexander Baring Bingham had a large estate of his own, too large to make the inference clear that he must have intended to execute the power contained in the will of William Bingham. * * * It is possible, but not certain, that he intended an execution of the power. It must not be forgotten, when handling such a question, that we are dealing with the property of another, and not with that of the donee of the power. In the donee it is but a trust, and those interested in the estate of William Bingham have a right to know that the will of their testator has been actually executed as he intended by the donee of his power. Hence, they are entitled to certainties, not mere conjectures or possibilities." And in *Cotting* v. *De Sartiges, supra,* it is said: "The fact that at the time of his (the testator's) death his estate was somewhat less than his bequests is not significant; for, evidently, he was not a close financier, and gave little heed to the depreciation of his estate. The deficiency, however, is not so marked as to raise a presumption in favor of the execution of the power, even if we could properly look to that fact for that purpose."

Kent, in his *Commentaries,* volume 4, page 335, lays down the rule, which may be found in almost all of the cases on this topic, that

"if the will be made without any reference to the power, it operates as an appointment under the power, provided it cannot have operation without the power. The intent must be so clear that no other reasonable intent can be imputed to the will; and if the will does not refer to a power, or the subject of it, and if the words of the will may be

satisfied without supposing an intention to execute the power, then, unless the intent to execute the power be clearly expressed, it is no execution of it."

A prominent index of intention is to be found in the fact that the testatrix, by her codicil, deliberately revoked the execution of the power which she had previously on three different occasions exercised. This naturally leaves the impression that her own estate, being sufficient to meet the demands of her will, she intended to withhold the appointment and to allow the trust fund to devolve under her father's will. The correctness of this deduction, of course, is not essential to this decision, for, in whatever aspect the act be viewed, it is at least to be regarded as neutralizing any inference in opposition. A similar situation was approached and treated from another, and perhaps the correct, angle, in *Wilkins* v. *Pryer, 55 L. J. Ch. 598.* There the testatrix exercised a power of appointment, and in subsequent wills, without referring to the appointed property by a general clause, revoked all former wills and testamentary disposition which was held to revoke the appointment. In dealing with the subject, the court said: "I should have thought that it was impossible for the court to come to any other conclusion, because it would have to be arrived at upon the merest possible speculation; and how, as I have asked more than once during the argument, can the court know that it was not the deliberate intention of the testatrix to revoke the testamentary appointment of 1866 and to allow the estate to devolve as in default of appointment under the settlement of 1834? If I cannot tell, it is obvious that if I were to hold that the words which *prima facie* are quite sufficient to revoke the testamentary appointment did not have that operation, I could only arrive at that result by speculating as to what was the intention of the testatrix, and such a speculation might lead the court into complete error. It may have been the intention of the testatrix to allow the property to devolve under the trust in default of appointment, and if I were to hold that the words of revocation, which may have been designedly inserted for that very purpose, are not to have any operation, I might be defeating instead of carrying out her intention."

My conclusion, from the foregoing observations, is that the power of appointment was not exercised, and that the trust fund falls into the residue of the estate of Paul Farnum. A decree will be advised directing the trustee to account and to pay over the property to the complainants.